**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br> )<br>      Plaintiff, )<br> )<br> )<br> )<br>vs. )<br> )<br> )<br> )<br> )<br>CORINE D. MOTLEY, )<br> )<br>      Defendant. )<br>_____ ) | **Case No. 3:13cr6/RV**<br><br>**Pensacola, Florida**<br>**June 17, 2013**<br>**3:18 p.m.** |

**TRANSCRIPT OF SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE ROGER VINSON**
**SENIOR UNITED STATES DISTRICT JUDGE**
**(Pages 1-35)**

| | |
|---|---|
| **FOR THE GOVERNMENT:** | **DAVID L. GOLDBERG, ESQUIRE**<br>**United States Attorney's Office**<br>**21 East Garden Street, Suite 400**<br>**Pensacola, Florida  32502** |
| **FOR THE DEFENDANT:** | **RANDALL LOCKHART, ESQUIRE**<br>**Office of the Federal Public Defender**<br>**3 West Garden Street, Suite 200**<br>**Pensacola, Florida  32502** |

**PROCEEDINGS**

**(Court called to order; Defendant present with counsel.)**

THE COURT:  Please be seated.  Next we have sentencing for Corine D. Motley in Case 3:13cr006.  So counsel, please come down in front of the clerk's bench with the Defendant.

**(At the bench.)**

THE COURT:  Mr. Lockhart, good afternoon.

MR. LOCKHART:  Good morning, Judge.

THE COURT:  Mr. Goldberg, good afternoon.

MR. GOLDBERG:  Good afternoon.

THE COURT:  Corine D. Motley, pursuant to your plea of guilty to Count One of the superseding indictment charging you in this case, I hereby adjudge you guilty as charged in Count One of that superseding indictment.

Now, before I impose sentence this afternoon, you will have an opportunity to speak both personally and through your attorney about anything at all that you believe I should know. But before we get to that, I need to ask you about the Presentence Investigation Report that's been prepared by the Probation Office.

Have you received a copy of that report and have you carefully read it and gone over it with your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And have you found any factual errors in that report that have not been corrected?

THE DEFENDANT:  No, Your Honor.

THE COURT:  As far as you can tell, it's accurate?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I don't think there are any objections from the Defendant.  Is that right, Mr. Lockhart?

MR. LOCKHART:  That's correct, Judge.

THE COURT:  And no objections from the Government either?

MR. GOLDBERG:  No, Your Honor.

THE COURT:  Mr. Lockhart, would you like to speak on behalf of Ms. Motley?

MR. LOCKHART:  I would, Judge, and briefly I would say --

THE COURT:  And I have received your sentencing memorandum, by the way, and the attachment.  I presume you want that attached and made a part of the record --

MR. LOCKHART:  I would, Judge.

THE COURT:  -- as well as your sentencing memorandum?

MR. LOCKHART:  Yes, please.

THE COURT:  So it will be filed under seal; I think I entered an order to that effect.

MR. LOCKHART:  And I did see that order, Judge.  And I would say in relation to the guideline range, there was not an objection.  The only guideline objection that was contemplated was the same objection that was raised by Mr. Gillreath.

For different reasons we decided not to raise that objection, in large part because we feel that the Eleventh Circuit case law was sufficient to substantiate that any time there's sexual contact between an adult and a minor that it is essentially S and M. And as a result of that, we didn't feel the circumstances would change if that was a female versus male.

So for that reason, there are no objections, but extensive clarification. And I know the Court has seen those as well as a sentencing memorandum. So from that basis, I would highlight what I've already raised in front of the Court in relationship to what we are already requesting from the Court as to sentence.

Before I do that, Judge, Ms. Motley has provided me with four different documents from the Escambia County jail. Just briefly, one document substantiates that she was recently baptized, Your Honor. She also participated in bible study. There's three certificates in relationship to that.

There is -- it's called Most Excellent Way. I'm sure the Court probably over the years has heard of that. There's a short note from a woman named Jean Leslie, the instructor, who wrote a short note about Ms. Motley. And I would submit these.

I've shown them to Mr. Goldberg. We don't want to spend a lot of time on them, but I would submit them as a single exhibit, and the exhibit would be --

**THE COURT:** It will be Defendant's Exhibit -- how many

are there?

MR. LOCKHART:  There's 4.  There's one certificate regarding the baptism and the others relate to --

THE COURT:  Any objection by the Government?

MR. GOLDBERG:  No, Your Honor.

THE COURT:  All right.

(Defendant's Exhibits 1-4 admitted into evidence.)

MR. LOCKHART:  As to sentencing, Judge, certainly this case couldn't be any more serious.  As the Court knows from the sentencing memorandum I filed and looking even at the guideline statistics in relationship to the average sentencing ranges, in cases like this they certainly get up there in terms of length of time as high as almost any or oftentimes higher than offenses that we would argue that are traditionally looked at even more seriously such as homicides.

It's our position in this case that Ms. Motley should not be sentenced to 360 months.  Obviously, through the calculation of her guideline range, she quickly becomes life. She's essentially off the chart fairly quickly.  I've addressed that in my sentencing memorandum.

I think there should be some pause by the Court in relationship to how quickly that happens and whether or not there's any realistic range that's ever proposed in these types of cases involving sexual contact in terms of what is the likelihood and frequency with which the guidelines actually

produce a range that's anywhere near that bottom mandatory minimum.

Even in federal court where we see high sentences meted out frequently in cases with individuals with significant prior criminal histories, in a number of different types of cases, particularly guns and drugs, this case is obviously completely different.

The guidelines range is 360 months flat for a woman who has essentially no prior contact with law enforcement other than a prior juvenile conviction when she was a minor. She's never spent a day in jail.

We feel that Ms. Motley's sentence should be nowhere near as severe as Co-Defendant Gillreath's sentence, and in large part I think there's four main reasons why. We've gone to great pains to point out that -- what the environment was that Ms. Motley grew up in.

We feel that -- and it speaks for itself -- that it was incredibly dysfunctional, primarily the exposure that she had with her own family, her father in particular, who ironically she was very close to and loves, misses dearly -- he passed away in 2009.

But she essentially grew up in a family that was incredibly dysfunctional and even lived in the family home under the same misinfluences until she was in her early twenties. She lived in that home even when she met Brandon Gillreath, and they

lived there for a number of months until they moved out and she was in her early twenties.

Now, we know from the information that she's provided law enforcement, we know from the information that she's provided to Probation, we know from the information that we've gleaned from her relatives, and we know from the information that she's provided me that that was an incredibly destructive, disturbing, dysfunctional, atypical, and problematic environment in which she was the equivalent of a victim.

We know that it was an environment in which her own father openly exhibited sexual behavior in the home where she was exhibited -- basically exposed to graphic sexual behavior by him such as masturbating openly in front of her on a repeated basis in her lifetime in that home, walking in on her -- odd things even -- walking in on her with -- her biological brother -- while she was undressed and not essentially turning away, openly talking to her about sex, sex paraphernalia and pornography throughout the home, openly using drugs and encouraging her to use drugs throughout her lifetime, predicting and essentially cajoling her to use drugs, talking to her about the use of drugs would free her inhibitions so that she could further explore her sexuality, encouraging her on at least one occasion where he saw her apparently performing oral sex with a boyfriend when she was a young woman and basically telling her "Go for it," things of this nature.

This was Ms. Motley's reality, and it was a warped reality. We think that -- we don't know to what extent it's affected Ms. Motley. Dr. Turner certainly tried to opine about that. But I think it's fair to say that and I think it's largely undeniable that it certainly shaped her reality, it shaped her ability to be able to recognize what is and what is not a healthy environment, what is and what is not acceptable in our community.

And we feel that that, in large part, contributed to a deficit which certainly exists in Ms. Motley in relationship to responses to Dr. Turner and to agents such as that the children, her daughter in particular, were allowed to consent, for example, to some of these behaviors, where that's just so -- those types of responses are so divorced from what we would call a normal, healthy reality. We have to look back at her history and see how that could be and seek some explanation.

And we know in addition that it wasn't just her environment, her upbringing in that family, that she was also repeatedly sexually victimized by her brother living in the home certainly and exposed to her father and her father's -- and her parents' influences, but also by an adult who was a family friend with the initials D.S. who is referenced in the Presentence Report and throughout the sentencing memo, as well as even a sexual assault that occurred from an employee while she was employed at Dick's Sporting Goods.

And so we know from abuse victims, just like we've heard certain testimony today from minors what the ramifications are.  It can stunt one's developmental growth, it can affect one's maturity, it affects how one exhibits themselves, it causes behavioral problems, it causes dependency issues.

The clinical information about what we see from female victims of sexual assault and sexual molestation is fairly clear; higher risk of suicide, higher risk of substance abuse, early pregnancy, which certainly occurred in Ms. Motley's case, difficulty in school, which certainly occurred in Ms. Motley's case, risky sexual behavior when coupled with her upbringing certainly occurred in her case, antisocial problems and other behavior problems certainly we see that, stunted development in maturity as well as dependency and low self-esteem.

All of her relatives that we talked to explained that they felt that she had very low self-esteem.  Ms. Motley herself admitted that she had very low self-esteem.  And it was in that environment and she came from that environment in relationship to how she met Brandon Gillreath.

Brandon Gillreath, unlike Ms. Motley, we submit to the Court, is a predator, is a pedophile, did exercise control over Ms. Motley.  It was her -- I'm sorry -- it was his sole opinion and suggestion, in other words, he's the one that thought of Ms. Motley doing Internet modeling from the beginning.

He's also the one that encouraged her to include minor

children in relationship to requests from clients.  She did that for him, to make him happy.  And even leading up to that period of time, we submit that he was sexually abusing her daughter and other minors.

And so from that history, her history plus Mr. Gillreath's influences, there's no question but that Ms. Motley was in a very bad -- had a very bad or a certainly compromised ability to repel these suggestions.

And when we talked to Ms. Motley and we asked her how could this have happened and we get beyond her background and get to how she met Mr. Gillreath and she talks about not wanting to stop him, feeling that she couldn't stop him, even having fear that he would leave her, having fear that he would take their children with her.

And when we talked to the family members, they point out that she left with Mr. Gillreath, that she was basically in her early twenties, that she lived at home for a short period of time.  The family was very suspicious about Mr. Gillreath.  They started to see his influences over her.  They started to see that she was being essentially dominated or controlled by him to a certain degree.

And then they end up living in Northwest Florida, and she's even further removed from the family.  When her father died in 2009 she felt very alone.

She essentially looked at, ironically, Mr. Gillreath

as if he was her knight in shining armor.

And this is the same woman who, when we talked about early pregnancy in high school and had a child, and soon as -- and that's in the letters of recommendation as well, that as soon as that individual -- and I believe that individual's name is Thomas Duran?

**THE DEFENDANT:**  Dunham.

**MR. LOCKHART:**  Dunham -- that as soon as he found out Ms. Motley was pregnant, he dumped her, never provided her child support.

Her self esteem, as a result of her upbringing and these types of experiences, couldn't be lower, and she was susceptible to the influences of Mr. Gillreath, we feel that there is no doubt about that, and we feel that it created an environment where this crime occurred.

We feel that Ms. Motley would have never participated in this crime but for Brandon Gillreath, and we have no doubt about that.

We also know from Dr. Turner's report and looking at her prior history that she was not a danger.  He felt that her involvement in this was situational.  She does not derive primary or secondary sexual pleasure from or attraction to minors.  It just simply is not in her record.

She presents in a completely different fashion as Mr. Gillreath.  We feel that Mr. Gillreath is a child predator; we

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*One North Palafox Street * Pensacola, Florida  32502*
*850.470.8189*

feel that Ms. Motley is not.

The only thing in terms of what do we know beyond that that I can point out to the Court is, when you look at Ms. Motley's -- even her debrief, which certainly isn't articulated for the Court in any document that was filed, but I would say in the Presentence Report at least where there's a discussion with Ms. Motley about how this happened, she is frank, she is unvarnished in relationship to her explanations as to how it occurred.

And even to this day, despite the fact that she has acknowledged what has happened, she can articulate the severity of it, albeit I don't know that she could have months earlier, I can say that she's not the same woman that she was at the time this was committed.

But at the same time, that deficit still exists, Your Honor. And we feel that that deficit is, in large part, not as a result of her being a danger to the public or a pedophile or having even a pedophilia, which is a larger umbrella under which we talk about individuals who may be predators or a danger to the public through some kind of clinical sexual diagnosis or dependency.

That diagnosis exists, and it was created over years and years and years of growing up in this environment. And we submit that Ms. Motley being essentially matched up with Mr. Gillreath has created a situation where obviously she is -- this

is a person who was supposed to be her knight in shining armor. And where is she now?

The other thing that I would point out for the Court is she has fully cooperated. And unlike Mr. Gillreath, she's not seeking to withdraw her plea, she's not making inconsistent claims about her background.

She not only cooperated with the federal government, but unfortunately failed to do so earlier in time when she had the opportunity and could have assisted substantially the federal government when it wanted to indict Mr. Gillreath. And before the federal government on its own obtained the information to do so, Ms. Motley was essentially still under the spell of Mr. Gillreath.

He still contacts her through letters. We still feel that he has, to some degree, an influence over her. She feels that God will forgive him, that essentially he will change, but she knows deep in her heart he will not change and what he asked her to do and how he did that.

When I asked her to explain how that happened again she says he sweet-talked her, he had the ability to persuade her that it was normal. And we see that in other parts of her relationship with him, such as the two-sided rules that would apply to her but not to him, such as he would indicate that -- their relationship is incredibly dysfunctional, but he would indicate to her that it was okay for him to have sex with other

partners, it was okay for him to do myriad things within the relationship, and those same rules did not apply to her.

But she cooperated finally against him when he agreed to do so because she didn't want to hurt him.  And when she did, she told him that when she cooperated that she would do it 100 percent, that she would be completely truthful, and she did that.

She even made clarifications to the Presentence Report and she's correcting statements that Mr. Gillreath made in relationship to denials that he made that were incorrect, false, and lies to law enforcement regarding his sexual -- physical sexual activities with minors, including individuals who are not even linked up to this case.

And we're also asking the Court to take that into consideration because obviously she did so, it was in relationship to a man that she loved, it's a very difficult area, obviously, to talk about, and she was incredibly honest with law enforcement.

She's done everything she can in relationship to answering any questions they have about what happened in this case but also trying to clarify what Mr. Gillreath's involvement was in this case.

And that's essentially, too, how Ms. Motley got caught in this matter is that, when that video went public, local law enforcement was already familiar with Ms. Motley because Mr.

Gillreath was already suspected of sexually assaulting minors in their Miracle address neighborhood.

So we would point out that she has done everything that she can do to make this right. She also was pointed out to law enforcement by her customers and other things. And certainly Mr. Goldberg can correct me if I'm wrong, but we believe she's assisted them to the fullest extent.

The only other thing I would mention, Judge, is that 360 months is an incredibly long time. She's 25 years old. We don't know the woman that Ms. Motley is going to be 5 years from now, 10 years from now, 15 years from now. She's clearly not the same woman that she was when this crime ultimately occurred.

And we know, too, that even though the Bureau of Prisons has the sex offender management program, we know that she's not going to receive any treatment that's along the lines of the treatment that's recommended by someone like Dr. Turner, who has attached his opinion and his report is attached to the sentencing memorandum.

We know, too, from BOP's own documentation that it reflects that the sex offender management program is not "treatment" per se. She's not going to receive any treatment for the vast majority of her custodial sentence with the Bureau of Prisons, and that's a fact.

So we know that to the extent that she receives any type of treatment that the BOP has the ability to provide, she

will only really receive it when she nears the last year or possibly even the last two years of her sentence.

So in that regard, Judge, she will essentially be warehoused, she'll sit idle. And even with a 15-year sentence, she would come out anywhere in her late thirties, or if it were fully day for day, she would be 40.

The Bureau of Prisons also has the ability to move against her with regard to civilly committing her. Obviously I know the Court is familiar with what those standards are, but there is a long row to hoe for Ms. Motley.

And in addition, the Court has the ability to supervise her for life, and she's also subject to lifetime sex offender registration requirements.

It's an incredibly onerous path for Ms. Motley to move forward, and we submit to the Court that 15 years, with this history of victimization, this history of upbringing, her exposure to Brandon Gillreath, who is a predator, we feel that 15 years is more than sufficient to further the goals of federal sentencing, Judge.

THE COURT: Ms. Motley, would you like to speak personally?

THE DEFENDANT: Yes, Your Honor, I would, and the courts. He pretty much summed it all up, but I would like to say in my own words how sorry I am for -- for y'all -- I'm sorry. I never meant for any of this to happen. Oh, God, I'm

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*One North Palafox Street * Pensacola, Florida  32502*
*850.470.8189*

sorry.  I lost my kids, I lost my husband, I lost my heart, I lost everything.

And I would like to apologize to the family over there.  Can I do that, Your Honor, if they will let me?

**THE COURT:**  Yes, you can.

**THE DEFENDANT:**  I'm sorry, y'all.  From the bottom of my heart, I'm sorry.  That's it.

**THE COURT:**  Mr. Goldberg?

**MR. GOLDBERG:**  Your Honor, she lost all those things because she raped and sodomized children.  That's why she lost all this stuff.  It wasn't a one-day bank job.  It didn't just -- she's not a getaway driver.

Think about who the victim is for a moment in that video, 30-minute video.  That's how this whole case started, 30 minutes.  She orally, vaginally, and anally victimized a five-year-old for money, as outlined in PSR paragraphs 12 through 56, a five-year-old girl, 30 minutes, for money; PSR paragraph 64, ten-year-old girl.

And the entire defense argument seems to ignore the victims.  The Defendant knew this was wrong.

PSR paragraph 29, the Defendant denied victimizing other children when originally interviewed.  She got caught.  We had the video.  She admitted to the video, no one else.

PSR paragraph 64, images of the ten-year-old victim, deleted space.

Now, I can't tell the Court whether she deleted it or her husband is deleted it, but they knew it was wrong. You can't rape children, but she did, helpless children.

And now, a count for which she's been convicted, these children will be victimized in perpetuity. It's the discussion we constantly have in child pornography cases, this is the Defendant that created the market. She got paid to do it.

Your Honor, we have two victim impact statements regarding the victim in PSR paragraph 64 and PSR paragraphs 12 through 46. For purposes of the record, I will note that the Court heard them on the co-defendant's sentencing, Mr. Gillreath.

What I'd like to do, rather than have them reread into the record, they've been typed out by those who would speak, if I could just get a copy from Stephanie Pajor and Katherine Burns, who were involved in the counseling sessions, and move them in as exhibits rather than have them take up the Court's time.

THE COURT: Well, it's not taking up my time. They have the right to speak if they want to do that, but they don't have to.

MR. GOLDBERG: I understand, Your Honor. May I have a moment?

THE COURT: Yes.

MR. GOLDBERG: Your Honor, they've asked to read it

because Ms. Motley didn't get to hear it the first time.  So I'm going to have Stephanie Pajor from the Families First Network, who was a counselor involved in the counseling with A.M. and A.M.'s siblings noted in PSR paragraph 64, if I could have Ms. Pajor come up and read it into the record so the Defendant can hear it.

                    **THE COURT:**  Come on up.

                    Mr. Lockhart, you may have a seat with the Defendant.

                    Counsel, you can -- she's fine.

                    **MR. GOLDBERG:**  Okay.

                    **WITNESS STEPHANIE PAJOR:**  I'm -- (long pause) -- I'm the caseworker for three children.  Their ages range from 10, 11, and almost 14.  I get to see firsthand the effects of what has been done to these children.

                    I have a child that has a propensity to lash out with violence, slam their head against the wall, they kick out windows, and scale six-foot fences just in an effort to get away from those that are trying to help him.

                    I have a child that has been Baker-Acted three times and then placed on psychotropic medications in order to function normally.

                    I have a child that is desensitized and, because of this, is consistently spewing the details of what has been done to them.  A conversation can occur at a dinner table, in line in a supermarket, or during a car ride with other children.  There

is a need to get every single detail out, and quickly, no matter who is around.

I have a child that feels absolutely nothing, refuses to maintain connections with friends or anyone that are in a position to help them.

I have a child that will trust no one, a child that refuses to believe that things will get better, and a child that has no hope to feel normal again.

I have three children who are not allowed to be together as a family.  Each child is placed in separate homes due to the repercussions of what has been so violently done to them.

I have three children who will never be able to share a room even with other family due to the trauma they have suffered.

I have three children who will never be able -- is not afforded the luxury of having a childhood full of innocence, the freedom of being who they wish to become, and a right to feel safe.  What is the most important to these children is to feel safe again.

The damage to these children is unimaginable and it is unjustifiable.  These children will never be the same as their lives have been forever stained with the memories of what they have endured.

These children will continue therapy for possibly the

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*One North Palafox Street * Pensacola, Florida  32502*
*850.470.8189*

rest of their lives.  They will have an uphill battle and it will be difficult.

I have three children that wanted to be loved, protected, and again, most importantly, safe.  They trusted people that were caring for them and claimed to have loved them, and they were hurt.  I now have three children that believe in real life monsters.

I ask this:  Please impose the maximum sentence.

**MR. GOLDBERG:**  Your Honor, the next witness is Katherine Burns, the unit manager of Families First Network.

**THE COURT:**  All right.

**MR. GOLDBERG:**  She will be discussing the victim noted in PSR paragraphs 12 through 46 Your Honor is familiar with, and Ms. Burns was a part of that counseling.

**WITNESS KATHERINE BURNS:**  My role was to find these children a safe and stable environment where they could be raised.

These victim children have experienced more in their lifetime than they should have.  The abuse they endured will be something they will struggle with for the rest of their lives.

They should have had parents to protect them from this harm.  There should have been someone to be responsible for their care.  Instead, this Defendant preyed upon the children and took advantage of them in every way possible.

Luckily for these children, they have been saved from

this horrible environment of sexual exploitation and have a new place to call home.  These children have yet to show the behavioral and emotional trauma from what they have experienced.

Given the known extent of sexual abuse these victims have had, I am very concerned for what is yet to come for them. These children have voiced that they knew the sexual abuse was wrong.  However, unlike other victims, they had no parents willing to stand up and protect them.

I am confident the children can move on with their lives and not be defined by the horrible sexual abuse and exploitation they witnessed and were forced to be a part of.

Despite her knowledge of what was wrong -- of Corine's knowledge and the fact that she was victimized as a child, I find it hard to believe that she would do that to another child knowing how hard it was for her to have been victimized.

Therefore, I ask that you give her the maximum that you can by law.  Thank you.

**MR. GOLDBERG:**  So, Your Honor, in response to those PSR paragraphs that I just cited and the statements made by Ms. Pajor and Ms. Burns, what we have in response to that is the Defendant requesting the bare minimum sentence allowed by law.

And I respectfully suggest that such a request offends the notion of justice, deterrence, and the United States Sentencing Commission.

The way I understand it, the Defendant suggests she

deserves some sort of mercy because she was the victim of a dysfunctional childhood and her co-defendant husband is more to blame. But that's just not good enough.

As the PSR states in her psychological report, the Defendant was no doubt the victim of unwanted advances and criminal touching, but her victims at her hand were orally, vaginally, and anally penetrated by her own hand. There is no comparison to the victimization that she made them endure for money.

The co-defendant was exposed to more prison. I understand what Mr. Lockhart argues, and I think it's a smart argument. But he was exposed to more imprisonment, that's why he had that extra count to pled to. He should do more time.

This Defendant is facing 360. Mr. Gillreath faced 420, and the Court saw fit to give that. Just because the co-defendant is worse does not absolve this Defendant of her behavior.

If this type of conduct does not require the most severe sentences, I frankly am not sure what does. I just -- the Defense comes and argues that, because the Defendant was victimized as a child, she somehow is excused from choices she makes as an adult.

But if you're hit as a child, you cannot become a batterer. If you live in a major city and you're shot as a child, you can't become a murderer. If you're touched as a

child or even molested as a child, you can't go on to rape and sodomize neighborhood children.  We can't accept that as a society.  That's just not good enough.

These were not -- this was not a one-time act, as I stated, it was over time, and I respectfully suggest that a sentence as requested by the Defense would not promote respect for the law.  It just wouldn't.

It's difficult to articulate what this Defendant has done.  You know the relationship of the victims to the Defendant as it's outlined in the PSR.  And as Ms. Burns articulated, the Defendant should have known better.

Indeed, in her own psychological report, a psychologist writes "Exposure to graphic sexual experience at an early age has been shown to have lifelong negative consequences for emotional development."

Well, that's what the Defendant has done to these children.  She may have had it done to her, and she should face a little bit less time than the co-defendant, but she has now done it to them.

Her psychologist also writes about the Defendant that she's likely to be somewhat rebellious, she's likely to exhibit poor judgment, she's likely to be self-centered, pleasure oriented, and she can be manipulative in her interpersonal relationships.

She had interpersonal relationships with the victims.

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*One North Palafox Street * Pensacola, Florida  32502*
*850.470.8189*

She has cooperated. And if that leads somewhere substantial, she will be rewarded. That's how the system works. Those investigations are pending.

But regardless of how the Court weighs the guidelines in 3553(a), the Court's sentence should reflect the harshness of the crime, its ongoing nature, and the betrayal of the innocence who trusted her most.

I respectfully suggest there is no persuasive reason to depart from the guidelines as outlined.

**THE COURT:** Mr. Lockhart, would you like to respond?

**MR. LOCKHART:** Briefly, Judge. We feel that in relationship to the Court's determination of what is a sufficient but not greater than necessary sentence, we feel that 15 years is an incredibly long sentence.

There is no question but that if individuals who are future offenders had knowledge that if they were to commit this type of crime and be convicted and that they were looking at a minimum of 15 years and that their sentence would be 15 years, no rational person would commit this offense.

I mean, it's just that simple. And I can't underscore enough that in relationship to calculating a sentence that complies with the parsimony clause, meaning sufficient but not greater than necessary, we're talking about warehousing this woman. She will not receive treatment.

And we know the BOP, more than ever before, has more

individuals to tend to, less money, less resources, less programming, and the programming that was available before is minimal. So she's going to -- if the Court sentenced her to 15 years, we could expect that she would be incarcerated idle for roughly 13 of those years.

So to the extent that the Court may reject that 15 years is not a sufficient sentence, I would just simply emphasize that, how much further do we have to go. And in my opinion, we get to the point to where we're not talking about what's sufficient or greater than necessary, but at what point are we simply setting out to completely destroy Corine Motley.

Now, the Government's reflexive response is always the seriousness of the crime, the seriousness of the crime, the seriousness of the crime, and the seriousness of the crime. And we know that, we know how serious it is. But it also divorces reality to have caseworkers come in here and indicate that Corine Motley should get life because these children have been permanently affected as a result of what happened to them, Your Honor.

And Corine Motley is the adult version of that. Now, granted, her sexual assaults arguably weren't as severe, but hers were repeated, they lasted longer. And as we know -- and most of what Mr. Goldberg said, respectfully, is completely at odds with all of the clinical data that we know, all the studies that have been done in relationship to what we know about

victims of sex offenses.

We know that they do oftentimes reoffend.  We know that they exhibit behavioral issues such as some of the issues that were in Dr. Turner's report that Mr. Goldberg read for the Court and for the record.  And that's not a surprise.  But the issue here is certainly to some extent that it's a single factor, the severity.

The other thing that I want to touch on just briefly is that it's repeatedly emphasized that this occurred and that it was done for money.

Well, it was done for money.  It was done for money at the behest of her husband in an occupation that was created for her by her husband that she participated in.  And the money that she received was the money that she received indirectly as a result of the fact that the money went to Brandon Gillreath, not Corine Motley.

And certainly she benefited from it to the extent that she lived in the household with him, but the Government will not refute that he controlled her, he controlled her income, he controlled her screen names, he controlled all the computers. This entire crime was his idea.  And it is relevant, it's relevant of culpability, it's unwarranted disparity.

We believe that 15 years is too much.  And that's not to say -- to take anything away from the severity of the crime, but we feel that warehousing her for 13-plus years on a 15-year

sentence is more than adequate, especially when you take into account that she'll be on lifetime supervised release presumably and also subject to the registration requirements.

Thank you, Judge.

**THE COURT:**  Well, I've said it once:  This is a shocking case, out of all the cases I've handled.  It's probably the most difficult to deal with because it's beyond our comprehension that these things happen.  And of all the child pornography cases that I've handled and which sentences that I think are probably much more severe that are warranted, in this case I don't think the severe sentence is unwarranted at all because a severe sentence is fully warranted.

It is a very serious matter.  The lives of children possibly have been ruined forever.  We all operate in the game of life with a handicap, some a lot more than others.  The children that have to go through this start off with a terrible handicap, and we can only hope that they survive it successfully.

Ms. Motley, I have carefully reviewed everything in your Presentence Investigation Report.  And subject to any corrections we've made on the record, I find that it is accurate and it's incorporated into and made a part of your sentence.

Now, under the authority of the Sentencing Reform Act of 1984 and the amendments to the act and the guidelines and policy statements of the United States Sentencing Commission,

and the court interpretation of those guidelines in the underlying law by the courts, it is the judgment of the Court that you're hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 354 months.

This sentence, which is below the advisory guidelines range of life, is very near the maximum sentence permitted by statute and is imposed pursuant to Guideline 5G1.1(a) of the Sentencing Guidelines.

It represents a slight variance in consideration of the Section 3553(a) factors that I'll mention in just a moment, particularly to give you the benefit of a plea of guilty and not putting the Government and the taxpayers to the cost of a trial in this very difficult case, but also to recognize your truthfulness and cooperation with law enforcement and an amazing amount of candor and acknowledgment.

The sentence itself is imposed after careful consideration and review of all the factors set out by statute in Title 18, United States Code, Section 3553(a), and of course taking into account the advisory nature of the Sentencing Guidelines themselves.

It's my conclusion that the sentence I've imposed is reasonable under the circumstances, and is sufficient to comply with those statutory purposes.

As I indicated in the prior sentencing, this sentence itself is intended to meet the goals of punishment as well as

specific deterrence to keep you from doing anything similar and general deterrence to keep others who may be in a comparable situation from doing the same thing.

It is my recommendation to the Bureau of Prisons that while you're incarcerated you'll participate in the Bureau of Prisons Sex Offender Treatment Program or such similar program as may be offered at the institution where you're located by the Bureau of Prisons.

I think I need to confirm that the Government is not seeking restitution in this case either, Mr. Goldberg?

**MR. GOLDBERG:** Your Honor, that can be confirmed. I spoke with Ms. Burns who spoke earlier that the victims attendant to the conduct of this Defendant are receiving the counseling which is covered by Medicaid, so there is no need to proceed with any restitution.

**THE COURT:** Very well.

Based upon the information I have been provided, I find that Ms. Motley does not have the financial ability to pay a fine within the guideline range or even below that range, so therefore I waive the imposition of a fine in the interest of justice. But as the law requires, a special monetary assessment of $100 must be and is ordered, which is due and payable immediately.

Ms. Motley, upon release from incarceration, you'll be placed on supervised release for a term of 20 years under the

standard conditions of supervision adopted by this Court with the following special conditions:

First:  You'll participate in and successfully complete a sex offender treatment program which may include testing by the treatment provider.  You may be required to pay or contribute to the cost of the services based upon your financial ability.

Second:  In accordance with Title 42, United States Code, Section 16913, and Florida Statute 775.21 and 943.0435, you shall register as a sex offender in each jurisdiction where you reside or may be employed.  For initial registration purposes, your registration will be in this jurisdiction, Florida.

Your registration initially must be before you complete the sentence of imprisonment in this case, and you'll be required to keep that registration current by appearing in person in any jurisdiction where you're registered, reporting any changes in your name, residence, employment, or other status.

Third:  You'll not be in the presence of minors or have any contact in any form, direct or indirect, including but not limited to personally, by computer, telephone, letter, or through another person with children under the age of 18 without the prior approval of the supervising U.S. Probation Officer. Any contact that is not approved must be reported immediately to

that probation officer.

Fourth:  Your employment shall be restricted to the district and division where you reside and are being supervised unless approved by the Court.

Prior to accepting any form of employment, you shall seek the approval of the supervising U.S. Probation Officer in order to allow that probation officer the opportunity to assess any risk to the community that you may pose if employed in that particular capacity.  Employers shall be informed of your offense of conviction.

Any residence you have must be preapproved by the supervising U.S. Probation Officer to ensure that you're in compliance with local or county ordinances and state law.

Six:  You shall submit to a search of your person, property, house of residence, vehicle, papers, computers, or other electronic communication, data storage devices, or media, and personal affects at any time with or without a warrant by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of your supervision conditions.

Seventh:  You shall not possess or have under your control any material that depicts sexual activities with minors.

Eighth:  You shall not possess or use a computer, cellular telephone, or any device with access to any online service at any time at any location without prior approval from

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*One North Palafox Street * Pensacola, Florida  32502*
*850.470.8189*

the supervising U.S. Probation Officer.  This includes access to any Internet service provider, bulletin board system, email system, or a public or private computer network system.

You shall permit routine inspection of your computer system or any other computer system maintained at your residence, including hard drives or any media storage materials to confirm adherence to this condition.  Any inspection shall be no more intrusive than is absolutely necessary to ensure compliance.

You shall inform any employer or third party who may be impacted by this condition of this computer-related restriction and the computer inspection provisions.

Ninth:  You shall participation in a program of mental health counseling and/or treatment.

Tenth:  You shall be evaluated for substance abuse and referred to treatment as determined necessary through an evaluation process.  Treatment is not limited to but may include participation in a Cognitive Behavior Therapy program.

The Defendant may be tested for presence of illegal controlled substance or alcohol at any time during the term of supervision.

And finally, I need to include that the Defendant will be enrolled at the discretion of the supervising U.S. Probation Officer in any mental health treatment or mental health counseling program.

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*One North Palafox Street * Pensacola, Florida  32502*
*850.470.8189*

I think that concludes all the conditions.

Counsel, do you have any objections that need to be amplified further with respect to the sentence that I've imposed?

**MR. LOCKHART:**  Nothing further, Judge.

**MR. GOLDBERG:**  Your Honor, the Government would move, pursuant to agreement, to dismiss the remaining counts as regards Ms. Motley.

**THE COURT:**  The remaining counts charging Ms. Motley other than Count One are hereby dismissed and the motion is granted.

Ms. Motley, you are advised that you do have the right to appeal from the sentence and judgment that I've imposed.  Any appeal has to be filed within 14 days.

If you are unable to afford the cost of an appeal, you may apply for leave to appeal in forma pauperis, which, if granted, will allow you to take an appeal without any cost to you.

I'm sure that Mr. Lockhart will discuss that matter with you more before he leaves today.  If you feel you have grounds for an appeal, upon request the clerk will immediately file a notice of appeal on your behalf.  And I remind you again that any appeal has to be filed within 14 days.

All right.  I think that concludes our sentencing.  Anything else from counsel?

MR. GOLDBERG:  Nothing from the Government.

MR. LOCKHART:  Nothing, Judge.

THE COURT:  With that, we are adjourned.

*(Proceedings concluded at 4:10 p.m.)*

--------------------

*I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.*

*s/Donna L. Boland*                          *9-24-2013*
*Donna L. Boland, RPR, FCRR*                 *Date*
*Official Court Reporter*